# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-613V
### Filed: January 23, 2026

|  |  |
|---|---|
| LINDA BUTLER,<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Special Master Horner |

*Laura Levenberg, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Madelyn Weeks, U.S. Department of Justice, Washington, DC, for respondent.*

## FINDINGS OF FACT[1]

On June 3, 2022, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012)[2], alleging she suffered a right shoulder injury related to vaccine administration ("SIRVA") following receipt of her September 11, 2020 influenza ("flu") vaccination at Rite Aid Pharmacy.  (ECF No. 1.)  In November of 2025, she moved for fact findings as to the injection site of the vaccination at issue and the timing of onset of her right shoulder pain.  (ECF No. 46.)  For the reasons discussed below, I conclude that petitioner received the subject vaccination in her right arm as alleged and that onset of shoulder pain occurred within 48 hours of the vaccination.

## I.    Procedural History

The petition was initially accompanied by medical records and a declaration marked as Exhibits 1-6.  (ECF No. 1.)  While the case was in pre-assignment review,

---

[1] Because this document contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy.  If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

petitioner filed an additional vaccine administration record as Exhibit 7.  (ECF No. 10.)  Whereas petitioner alleged a right-side SIRVA, the administration records filed at Exhibits 1 and 7 documented a left-side vaccine administration.  (Ex. 1, p. 1; Ex. 7, pp. 4, 6.)  The case was assigned to the Chief Special Master as part of the Special Processing Unit ("SPU") based on the allegations of the petition.  (ECF Nos. 12-13.)  While the case was pending in the SPU, petitioner filed additional medical records marked as Exhibits 8, 10, and 11, as well as a supplemental declaration marked as Exhibit 9.  (ECF Nos. 25, 29, 31, 36.)

However, the case could not be resolved informally within the SPU.  (ECF No. 38.)  Respondent filed his Rule 4(c) Report in November of 2023.  (ECF No. 27.)  In pertinent part, respondent argued that compensation was not appropriate both because petitioner's vaccination was administered in the shoulder opposite her alleged injury and because the medical records did not support an onset of shoulder pain occurring within 48 hours of vaccination.  (*Id.* at 4-5.)

Between January and March of 2024, the parties briefed a motion for a ruling on the written record (ECF Nos. 30, 32-33); however, in July of 2025, the Chief Special Master concluded that the factual issues likely required further development of the record (ECF No. 38).  Therefore, he reassigned the case to the undersigned for further litigation rather than ruling on the motion.  (ECF Nos. 38-39.)  Thereafter, I held a fact hearing on September 11, 2025, with petitioner as the sole witness.  (ECF No. 41; *see* Transcript of Proceedings ("Tr."), at ECF No. 45.)  During the hearing, petitioner testified that she had kept notes regarding the course of her condition.  (Tr. 20-22.)  Those notes were subsequently filed as Exhibit 12.  (ECF No. 42.)

The parties were given a deadline of October 14, 2025, to file any further evidence that they wished to have considered, and petitioner was directed to then file a motion for findings of fact (Non-PDF Scheduling Order, filed Sept. 11, 2025), which she did on November 13, 2025 (ECF No. 46).  That motion is fully briefed.  (ECF Nos. 47-48.)  Petitioner requests two findings of fact: (1) that she received the flu vaccine in her right arm/shoulder and (2) experienced right shoulder pain within forty-eight (48) hours of her September 11, 2020 vaccination.  (ECF No. 46, p. 11; ECF No 48, p. 6.)  Respondent requests that petitioner's motion be denied insofar as he requests a finding of fact "concluding that petitioner has failed to provide preponderant evidence to support both her claimed site of vaccine administration and her claimed onset of shoulder pain." (ECF No. 47, pp. 1, 19.)

In light of the above, I have concluded that the parties have had a full and fair opportunity to develop the record and that it is appropriate to resolve the fact issues presented by the parties on the existing record.  *See Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (citing *Simanski v. Sec'y of Health & Human Servs.*, 671 F.3d 1368, 1385 (Fed. Cir. 2012)); *see also* Vaccine Rule 8(d); Vaccine Rule 3(b)(2).

2

## II.    Factual History

### a. As reflected in medical records

The available primary care medical records (Dr. Luetke) date back to January of 2017.  (Ex. 2, p. 7.)  The records are in a standard format and appear to the undersigned to generally reflect an ordinary level of detail.  Petitioner saw Dr. Luetke regularly and raised a number of different complaints, though generally not involving musculoskeletal issues.  (*Id.* at 7-51.)

However, petitioner has also filed orthopedic medical records dating back to February of 2019, which show that Dr. Luetke referred petitioner to Rothman Orthopedics (Dr. Stolzenberg) for a complaint of lower back pain radiating to the legs for which she was first seen in October of 2019.  (Ex. 3, pp. 29-31.)  She had several follow ups for this issue, which was ultimately diagnosed as lumber stenosis with neurogenic claudication.  (Ex. 3, pp. 20-27.)  Despite Dr. Luetke being listed in the orthopedic records as the referring physician (*Id.* at 20-31), there is only a single reference of back pain in Dr. Luetke's records (*see generally* Ex. 2).  In the record for petitioner's encounter on April 23, 2018, Dr. Luetke documented under review of systems that petitioner reported "[b]ack pain:  On the left side."  (*Id.* at 28.)  However, Dr. Luetke did not document any musculoskeletal concerns or reference petitioner's reported back pain on physical exam.  (*Id.* at 32.)  Nor does this record document the orthopedic referral.  (*See id.* at 28-35.)  Later records by Dr. Luetke from October of 2018, April of 2019, and October of 2019 do not document any musculoskeletal complaints on either review of systems or physical exam.  (*See id.* at 35-47.)  Nor do these records document either the fact of the orthopedic referral.  (*Id.*)

Prior to the events at issue, petitioner last saw Dr. Luetke during a telemedicine visit on April 21, 2020.  (Ex. 2, pp. 48-51.)  At that time, Dr. Luetke followed up with petitioner regarding ongoing issues of anxiety, hypertension, dyslipidemia, UTIs, and GERD.  (*Id.* at 48.)  Petitioner was to have a follow up in six months.  (*Id.* at 49.)  In the interim, petitioner received the flu vaccination at issue at Rite Aid pharmacy on September 11, 2020.  (Exs. 1, 7.)  Both the electronic record and the handwritten consent and administration form document a left-side administration.  (Ex. 1, p. 1; Ex. 7, pp. 4, 6.)

On October 20, 2020, petitioner presented to Dr. Luetke for her six month follow up regarding her hypertension, dyslipidemia, GERD, and anxiety.  (Ex. 2, p. 52.)  The history indicates that "[s]he had her flu vac last month," but does not include any complaint of shoulder pain.  (*Id.*)  Neither the review of systems nor the physical exam document any shoulder pain.  (*Id.*)  Notably, however, the musculoskeletal exam documents only "normal gait," which is consistent with how the musculoskeletal exam was documented at many prior encounters.  (*Id.*)  No mention of any orthopedic referral is made.  (*See id.* at 52-57.)  Petitioner was administered a pneumococcal vaccination at this encounter.  (*Id.* at 56.)  The site of administration was not documented.  (*See id.*)  No further records from Dr. Luetke have been filed.

3

Subsequently, on December 15, 2020, petitioner returned to Rothman Orthopedics (Dr. Williams) with a complaint of bilateral shoulder pain.  (Ex. 3, p. 15.)  Dr. Luetke is again noted to be the referring physician.  (*Id.*)  The history of present illness was as follows:

> Linda is a 72-year-old right-hand dominant retired schoolteacher who likes to play with her grandkids.  She has an interesting story.  She had normal shoulders until September 11 of 2020 when she had a flu vaccine in her right shoulder and has had right shoulder pain ever since.  The same exact thing happened on her left side with a Pneumovax vaccine on October 23, 2020.  Her right shoulder is worse than her left but they both bother her.  She tells me that she has 50% normal function on the right compared to 60% on the left.  As far as pain is concerned, both of her shoulders are 5 out of 10 at their best.  The left one is 7 out of 10 at its worst [and] the right one is 8 out of 10 at its worse.  She does get some pain in her neck as well.  She has been taking Aleve for it which helps a little.  She has had no physical therapy [and] no injections.

(*Id.*)

Given the specific factual questions at issue, the orthopedist's assessment and petitioner's later course of treatment are not relevant at this juncture and will not be detailed.  However, it is notable that as of January 8, 2021, the orthopedist documented that "I still think that her pain is related to when she had her injections for the vaccines.  The reason I say that is because the symptoms that she has a[re] really not consistent with rotator cuff disease and/or arthritis."  (Ex. 3, pp. 11-12.)  Petitioner was then referred to physical therapy.  (*Id.* at 9.)

At her initial physical therapy evaluation on January 20, 2021, petitioner again provided the history of her condition.  (Ex. 4, p. 16.)  At that time, it was noted that petitioner's presentation is consistent with SIRVA (*Id.* at 19), and that "following flu/pneumonia vaccines, pt [w]as experiencing prolonged pain at the site of vaccination" (*Id.* at 16 (omitting irregular spacing)).  Two separate dates of onset are listed, with the left shoulder injury being documented as occurring on October 20, 2020, and the right shoulder being documented as occurring on November 11, 2020.[3]  (*Id.*)  The fact of petitioner's December 15 encounter with Dr. Williams is also noted.  (*Id.*)

Several telephone records within petitioner's orthopedic records from around January of 2021 also indicate that petitioner sought to complete several forms to be

---

[3] Given that this history specifically identifies petitioner's condition as stemming from her flu vaccine, and given that the flu vaccine was administered on September 11 rather than November 11, and further given that petitioner had correctly reported the date of her flu vaccination to Dr. Williams the month prior, I find it reasonable when considering the record as a whole to conclude that this reference to "November" 11 is an error on the part of the physical therapist and that this record should have stated that onset was "September" 11.  (*See* Ex. 4, p. 16.)

4

submitted to Merck, the manufacturer of her pneumococcal vaccine.  (Ex. 3, pp. 8-10.)
The nature of the paperwork or the underlying reason for it are not indicated.  (*See id.*)
(Notably, Merck was not the manufacturer of petitioner's September 11, 2020 flu
vaccination, which is the only vaccination at issue in this case[4].)

### b.  Testimony

Petitioner recalled receiving the flu vaccine at issue in her right arm.  (Tr. 7.)
Because she is right-handed, petitioner typically receives any vaccines or injections in
her left arm.  (*Id.*; Ex. 6, ¶ 3; Ex. 9, ¶ 3.)  Accordingly, petitioner testified that when she
presented to RiteAid pharmacy for her flu vaccine on September 11, 2020, she
specifically requested that the vaccine be administered in her left arm.  (Tr. 39.)
However, petitioner stated that when she rolled up the sleeve of her left arm, the
vaccine administrator noticed a mark on her left shoulder, which petitioner identified as
an incision from a melanoma removal that she underwent in February of 2020.  (*Id.* at 7-
8; 40.)  Petitioner explained that this discovery prompted the vaccine administer to
decide to administer the flu vaccine into petitioner's right shoulder instead.  (*Id.* at 8, 40.)

Regarding the administration record for her flu vaccine, petitioner acknowledged
that the form indicates the vaccine was administered in her left arm.  (Tr. 40; Ex. 9, ¶ 4.)
However, petitioner asserted that this documentation is incorrect.  (Ex. 9, ¶ 4; Tr. 39-
40.)  Petitioner stated that she was not provided a copy of the vaccine administration
form when she received her flu vaccine, noting that she did not obtain a copy of the
record until she returned to the pharmacy to specifically request a copy.  (Tr. 40.)  She
testified that when she presented to the pharmacy requesting a flu vaccine, she was
given a consent form to fill out, at which time she indicated that she wanted the vaccine
administered in her left arm.  (*Id.* at 39-40.)  However, petitioner explained this form was
filled out prior to the administration of the vaccine and the administrator's discovery of
petitioner's melanoma site on her left arm.  (*Id.*)  When asked whether the pharmacist
filled out the handwritten portion of the vaccine administration form in front of her,
petitioner responded "I do not believe so."  (*Id.* at 40.)  Petitioner could not recall
whether the pharmacist had any of the forms when she came out to administer the flu
vaccine to petitioner.  (*Id.* at 41.)

---

[4] The petition does not seek compensation for any left shoulder injury.  (ECF No. 1.)  Only pneumococcal
conjugate vaccines are included in this program.  *See* 42 C.F.R § 100.3(a).  Petitioner's medical record is
a bit ambiguous with respect to the exact vaccination she received.  (Ex. 2, p. 56.)  The order for
vaccination states that petitioner should receive "PCV 23" and that a "pneumococcal 23-polyvalent
vaccine" was ordered.  (*Id.*)  "PCV" ordinarily stands for pneumococcal conjugate vaccine; however, the
undersigned is not aware of any 23-valent PCV.  *See* CDC, *Pneumococcal Vaccine Recommendations*
(Oct. 26, 2024), https://www.cdc.gov/pneumococcal/hcp/vaccine-recommendations/index.html
(documenting available PCV vaccines as being 15, 20, and 21 valent).  Given that the fact that the
vaccine was 23-valent was repeated, it seems most likely that the "PCV" abbreviation is an error.
Moreover, the fact that petitioner sought paperwork from Merck relative to her pneumococcal vaccine
would suggest that she received the Pneumovax 23 pneumococcal polysaccharide vaccine ("PPSV").
*See* FDA, *Pneumovax 23 – Pneumococcal Vaccine, Polyvalent* (Oct. 28, 2021),
https://www.fda.gov/vaccines-blood-biologics/vaccines/pneumovax-23-pneumococcal-vaccine-polyvalent.

Petitioner testified that the pain in her right shoulder pain began immediately after receiving her flu vaccine at issue. (Tr. 9-10; Ex. 9, ¶ 6.)  While she acknowledged that she typically experienced soreness for a few days after prior flu vaccines, petitioner described the pain she felt after her September 11, 2020 flu vaccine as becoming increasingly more uncomfortable, which was something she had not experienced before. (Tr. 10.)  She maintained that her right shoulder pain was achy, stabbing, and shooting, and stated that she had redness and swelling at the injection site. (*Id.*)  When asked if she did anything to address her right shoulder pain after returning home from receiving the flu vaccine, petitioner stated "I probably put ice on it . . . Rubbed it.  I might have taken a Tylenol." (*Id.* at 11.)  Petitioner averred that her right shoulder pain continually got worse. (*Id.*)  She testified that the pain in her right shoulder interfered with her activities of daily living, such as brushing her teeth, brushing and drying her hair, and household chores. (*Id.* at 11, 14-15, 20.)

Petitioner agreed that her primary care appointment on October 20, 2020 was her first encounter with a medical provider post-vaccination. (Tr. 12, 20.)  When asked why she did not seek care for her right shoulder pain sooner, petitioner explained that she hoped the pain would resolve on its own and that she knew she had this primary care appointment coming up, which had been scheduled since April of 2020 for management of chronic conditions. (*Id.*)  Petitioner testified that she informed her primary care provider, Dr. Luetke, that she started experiencing pain in her right shoulder after receiving the flu vaccine and that the pain was getting progressively worse. (*Id.* at 12-13, 31, 37.)  However, she acknowledged that Dr. Luetke did not document petitioner's report of right shoulder pain within the medical record for that encounter. (*Id.* at 38.)  When asked whether Dr. Luetke offered any recommendations to address her right shoulder pain, petitioner asserted that "she might have said to me, maybe you should see a shoulder specialist, but I don't – I can't say I recall that." (*Id.* at 31.)

After reviewing the record for the October 20, 2020 primary care encounter, petitioner agreed that Dr. Luetke documented issues that were bothering her at that time, such as details related to petitioner's anxiety. (Tr. 24-29.)  Petitioner testified that she has been generally satisfied with Dr. Luetke's care, and that she remains her primary care provider. (*Id.* at 23-24.)

At her primary care encounter on October 20, 2020, petitioner received a Pneumovax vaccination. (Tr. 13, 29.)  While petitioner acknowledged that the medical record does not include any documentation regarding the site of administration, petitioner testified that the Pneumovax vaccine was injected in her left arm. (*Id.* at 13, 30.)  She recalled informing the provider administering the vaccine that she was still experiencing discomfort in her right shoulder from the flu vaccine, which prompted the provider to administer the Pneumovax vaccine in petitioner's left arm. (*Id.* at 13; Ex. 9, ¶ 10.)  Petitioner confirmed that her melanoma site on her left arm was still present at the time of this encounter. (Tr. 30.)  Therefore, petitioner agreed that the presence of her melanoma site evidentially did not interfere with the injection of the Pneumovax vaccine into her left shoulder. (*Id.*)

6

Because her right shoulder pain did not resolve and continued to get progressively worse, petitioner sought care from an orthopedic specialist. (Ex. 9, ¶ 11; Tr. 31, 33-34.) Petitioner was evaluated by an orthopedic specialist, Dr. Williams, on December 15, 2020, which was the first available appointment she could book. (Tr. 13-14; Ex. 9, ¶ 12.) Prior to this appointment, petitioner and her husband did some research and learned about SIRVA. (*Id.* at 14, 22-23; Ex. 9, ¶ 11.) Petitioner felt her right shoulder injury could be consistent with SIRVA, and she reported this to Dr. Williams. (Tr. 14.) Dr. Williams informed petitioner that he believed her right shoulder pain was related to her flu vaccine. (*Id.*)

At the hearing, petitioner initially testified that she started recording handwritten notes about her right shoulder pain "pretty much after the injection" and "from the onset of the discomfort." (Tr. 20-21.) She stated that she tried to update these notes daily. (*Id.* at 21.) However, petitioner ultimately acknowledged she did not begin taking these notes until about a year after the vaccination (ECF No. 43). In contrast to having started note taking from the point of onset, she otherwise explained that she decided to document her right shoulder pain "[b]ecause this is something that just didn't go away." (Tr. 21-22.)

### III.    Respondent's Opposition

#### a.    <u>Injection site</u>

Respondent argues that the fact hearing testimony reflects that petitioner had "difficulty clearly recalling events that occurred five years earlier," noting that she often testified that she could not recall certain events or details and that she often used qualifiers such as "probably" or "I assume so." (ECF No. 47, p. 11.) Respondent further argues that petitioner's inability to recall is incongruent with the extended effort she took to reach out to Merck regarding her (pneumococcal) vaccination. (*Id.* at 12.) Similarly, he notes that petitioner was not able to remember "basic information" regarding her flu vaccination but was nonetheless able to recall other specific details. (*Id.*) Respondent therefore urges petitioner's recollection has degraded over the ensuing years and that her testimony should be given little weight. (*Id.*) Respondent stresses that both the electronic and handwritten vaccination administration forms for petitioner's flu vaccine are in agreement that the vaccine was administered in the left shoulder. (*Id.*)

Respondent also finds fault with the logic underlying petitioner's reasoning. (ECF No. 47, p. 13.) He notes that, contrary to what is asserted in her motion, she did not seek treatment for her shoulder pain promptly after her flu vaccination. (*Id.*) Instead, the records reflect that she first sought care for bilateral shoulder pain about three months post-vaccination. (*Id.*) However, by that time, she had also received a pneumococcal vaccination, the site of which was not documented. (*Id.*) Respondent is not persuaded by petitioner's explanation that she received the flu vaccine in her right arm due to a melanoma site on her left arm, because she asserted that she did ultimately receive her pneumococcal vaccination in the left arm. (*Id.* (citing Tr. 30).)

7

In sum, respondent argues that "the most likely scenario is also the simplest: due to the amount of time that passed between petitioner's vaccinations and the December 15, 2020 visit, it is more likely than not that petitioner confused the sites of administration and provided inaccurate histories to her doctors."  (ECF No. 47, p. 14.)

> b. <u>Onset</u>

Respondent stresses that a special master cannot making a finding of fact based on uncorroborated testimony alone.  (ECF No. 47, p. 14 (quoting *Clavio v. Sec'y of Health & Human Servs.*, 17-1179V, 2020 WL 1572946, at *7 (Fed. Cl. Spec. Mstr. Mar. 11, 2020).)  He argues that "the record as a whole sorely lacks evidence to corroborate petitioner's claimed onset."  (*Id.*)  He asserts that the contemporaneous medical records are "vague" with respect to onset, stressing that petitioner's testimonial statements are the first evidence presented that petitioner's pain began immediately after vaccination.  (*Id.*)  Moreover, during the hearing, petitioner did not describe her pain as immediate until she was prompted by counsel.  (*Id.* at 14-15 (citing Tr. 10).)  The fact that petitioner consistently attributed her pain to her vaccination does not necessarily demonstrate that she developed that pain specifically within 48 hours of vaccination.  (*Id.* at 15.)  Respondent also urges that petitioner's subsequent reports be weighed as only weak evidence given the absence of any report of shoulder pain at her October 20, 2020 primary care encounter, describing that omission as "particularly egregious" given that she testified to experiencing limitations in her daily activities.  (*Id.* at 16 (citing Tr. 10, 14-15, 19-20; Ex. 9, p. 1).)

Respondent raises several points to counter the assertion that Dr. Luetke failed to record petitioner's report of shoulder pain.  (ECF No. 47, pp. 17-18.)  First, it is uncorroborated and petitioner identified no other issues with Dr. Luetke's record.  (*Id.* at 17 (citing Tr. 24-25, 28).)  Second,

> in order to credit petitioner's explanation, the Court would essentially have to discredit Dr. Luetke, despite her detailed records and long history of providing satisfactory care to petitioner . . . according to petitioner's allegations, Dr. Luetke accurately documented petitioner's receipt of a flu vaccine but failed to document the subsequent five-week history of severe right shoulder pain that petitioner specifically related to the flu vaccination.

(*Id.*)  Third, petitioner's testimony implies that Dr. Luetke failed to adequately treat or even address petitioner's shoulder pain, stressing that petitioner could not even recall if Dr. Luetke referred her to a specialist.  (*Id.* at 18 (citing Tr. 31-32).)  However, petitioner testified that she has been satisfied with Dr. Luetke's care.  (*Id.* (citing Tr. 23-24).)

Respondent argues that petitioner cannot explain the silence of the October 20, 2020 record and that

8

[t]he most logical explanation for this silence is that petitioner did not report right shoulder pain during this visit because she was not suffering from right shoulder pain at this time.  In turn, common sense dictates that petitioner's right shoulder pain, first reported on December 15, 2020, must have started after the October 20, 2020 PCP visit.

(ECF No. 47, p. 18.)

## IV.    Legal Standard

Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove the facts supporting their claim by a preponderance of the evidence.  A special master must consider the record as a whole, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1).  However, the Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule is not absolute.  Afterall, "[m]edical records are only as accurate as the person providing the information."  *Parcells v. Sec'y of Health & Human Servs*., No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).  In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent."  2005 WL 6117475, at *19 (quoting *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992)).  Importantly, however, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."  *Murphy*, 23 Cl. Ct. at 733 (quoting the decision below), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992).

When witness testimony is offered to overcome the weight afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling."  *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  Further, the Special Master must consider the credibility of the individual offering the testimony.  *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).  In determining whether to afford greater weight to contemporaneous medical records or other evidence, such

as testimony, there must be evidence that this decision was the result of a rational determination. *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 300aa-12(d)(3); Vaccine Rule 8), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 417.

## V.    Discussion

### a. Petitioner's credibility

A primary argument from respondent is that petitioner's testimony should be given very little weight because, in his view, petitioner's memory was degraded. (ECF No. 47, p. 11.) As respondent explains, it is often noted that memory may become impaired by the time a person is called to testify, which is why contemporaneous records are generally valued as evidence. (*Id.* (citing *e.g.*, *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later").) I do not disagree that petitioner's recollection was incomplete in some instances. However, I do not agree that petitioner's memory was notably or unusually degraded, and I did find petitioner to be a credible witness on the whole. Respondent suggests that petitioner's use of qualifiers in her testimony such as "probably" or "I assume" detract from the testimony. (*Id.* at 11.) Yet, while these do constitute equivocations that must be weighed relative to the specific statements they qualify, I do not find that they detract from petitioner's overall credibility. That is, my impression of petitioner's testimony is that she did not attempt to overstate the completeness of her recollections. Therefore, respondent has not persuaded me that petitioner's clear recollections should be broadly distrusted.

### b. Injection Site

The factual question of injection site does arise repeatedly in SIRVA cases given that the site of injection needs to correlate to the affected shoulder. In that context:

> it is important that special masters recognize that vaccine administration records can sometimes be incorrect and that they should not be accepted reflexively. However, that is a far cry from presuming they are to be distrusted generally or without good reason. Vaccine administration records are still, after all, contemporaneous medical records.

*Anderson v. Sec'y of Health & Human Servs.*, No. 20-195V, 2023 WL 2237320, at *10 (Fed. Cl. Spec. Mstr. Feb. 2, 2023).

It has been previously explained that chain pharmacies do have a tendency to favor a notation of a left-side administration. In particular, deposition testimony by

pharmacists in prior cases has indicated that the injection site may be preemptively entered into the computer system prior to administration in order to permit the pharmacy to charge the customer/patient for the vaccination before actually completing the administration. *Stoliker v. Sec'y of Health & Human Servs*., No. 17-990V, 2018 WL 6718629, at *3-4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018); *Mezzacapo v. Sec'y of Health & Human Servs.*, No. 18-1977V, 2021 WL 1940435, at *4 (Fed. Cl. Spec. Mstr. Apr. 19, 2021). As a result, computer-generated chain pharmacy records have been noted to favor a left-shoulder administration as a default, because that is the more commonly requested shoulder for a vaccine administration. *Hanna v. Sec'y of Health & Human Servs.*, No. 18-1455V, 2021 WL 3486248, at *8 (Fed. Cl. Spec. Mstr. July 15, 2021). In that regard, handwritten administration notations, when correctly filled out, are generally weightier evidence than electronic records, because the consent and administration form is intended to be completed with the patient at the time of administration. *Anderson v. Sec'y of Health & Human Servs.*, 20-195V, 2022 WL 17484352, at *8-9 (Fed. Cl. Spec. Mstr. Nov. 10, 2022). Where both the computer and handwritten records are in agreement, the pharmacy records constitute clear and consistent contemporaneous records entitled to significant weight. *Magassouba v. Sec'y of Health & Human Servs.*, No. 20-762V, 2025 WL 1159796, at *10-15 (Fed. Cl. Spec. Mstr. Mar. 24, 2025).

Nonetheless, "treatment records are [also] probative on this issue because they are contemporaneous documents recorded by disinterested persons memorializing the fact that petitioner at that time understood her vaccination to have been administered in her [affected] shoulder, believed that to be relevant to assessing her condition, and sought treatment accordingly." *Hanna*, 2021 WL 3486248, at *9; *see also Mezzacapo*, 2021 WL 1940435, at *7. Moreover, as explained above, contemporaneous records must also be weighed against oral testimony. Thus, there is an established track record of prior cases in which vaccine injection site has been considered based on the totality of the evidence, even where the administration record itself conflicts with petitioner's allegation. *E.g.*, *Christensen v. Sec'y of Health & Human Servs.*, No. 19-0007V, 2022 WL 1020386, at *5-6 (Fed. Cl. Spec. Mstr. Feb. 28, 2022); *Syed v. Sec'y of Health & Human Servs.*, No. 19-1364V, 2021 WL 2229829, at *3-5 (Fed. Cl. Spec. Mstr. Apr. 28, 2021); *Irwin v. Sec'y of Health & Human Servs.*, No. 19-956V, 2021 WL 5504701, at *6 (Fed. Cl. Spec. Mstr. Oct. 18, 2021); *Baker v. Sec'y of Health & Human Servs.*, No. 19-1771V, 2020 WL 6580192, at *3-4 (Fed. Cl. Spec. Mstr. Oct. 9, 2020); *Boyd v. Sec'y of Health & Human Servs.*, No. 19-1107V, 2021 WL 4165160, at *5 (Fed. Cl. Spec. Mstr. Aug. 12, 2021).

Here, petitioner's vaccinations records from Rite Aid are clear and consistent in documenting a left-shoulder administration. (Exs. 1, 7.) This does make it harder for petitioner to overcome these notations. However, I also find petitioner credible in testifying that it was not until the last moment – after petitioner had already rolled up her left sleeve – that the vaccine administrator opted to instead administer the vaccine in petitioner's right shoulder after seeing her melanoma site. (Tr. 7-8.) In fact, petitioner did specifically testify that she requested a left-side administration. (*Id.* at 39-40.) This explanation can easily and reasonably account for how even the handwritten

11

administration record could be incorrect. Respondent stresses that petitioner was tentative in her recollection that the handwritten administration form was completed outside her presence (ECF No. 47, p. 13 (citing Tr. 40-41)); however, this detail is not in itself informative without more.

Respondent has not contested that petitioner had a melanoma site on her left arm. However, respondent doubts petitioner's explanation, because petitioner was later vaccinated in her left arm about five weeks later. (ECF No. 47, p. 13 (citing Tr. 30).) Importantly, however, petitioner did not testify that she requested the vaccine in her right rather than left shoulder. Instead, as noted above, she testified that she normally receives vaccinations in her left arm and that she requested to receive this vaccine in her left arm as well. (Tr. 7-8, 39-40.) And, in fact, she rolled up her left sleeve in order to receive the vaccination and it was the administrator, upon seeing her melanoma site, who decided to switch the arm of administration. (*Id.*) There is nothing suspicious or incongruent about the fact that a different administrator on a different occasion did not have the same reaction.

Petitioner's testimony that she received her flu vaccination in her right shoulder is also corroborated by her subsequent treatment records. When petitioner presented for orthopedic care, her orthopedist recorded a history that "[s]he had normal shoulders until September 11 of 2020 when she had a flu vaccine in her right shoulder and has had right shoulder pain ever since." (Ex. 3, p. 15.) Her later physical therapy evaluation is also consistent with that history. (Ex. 4, p. 16; *see also supra* note 3.) Respondent argues that petitioner's subsequent treatment history is not weighty because she did not report her shoulder pain to her primary care provider on October 20, 2020, and delayed seeking care until she was experiencing bilateral shoulder pain, which muddies the relevant history. (ECF No. 47, p. 13.) However, these arguments are not persuasive for the same reasons discussed relative to the question of onset as addressed below.

Accordingly, the evidence preponderates in favor of a finding that petitioner's September 11, 2020 flu vaccine was administered in her right shoulder despite the pharmacy administration record documenting a left-side administration.

### c. Onset

Because petitioner alleges a Table SIRVA, she must demonstrate by a preponderance of the evidence that her shoulder pain began within 48 hours of her vaccination. 42 C.F.R. § 100.3(a). In that regard, petitioner has clearly testified that her shoulder pain began immediately after vaccination. (Tr. 10.) However, stressing that uncorroborated testimony cannot be accepted, respondent raises three concerns: the October 20, 2020 primary care encounter record is silent as to shoulder pain; petitioner delayed seeking treatment; and the later resulting treatment records are vague as to onset. (ECF No. 47, pp. 14-19.) Respondent is not persuasive in raising any of these concerns.

12

First and foremost, respondent is not persuasive in contending that petitioner's actual treatment records are vague or fail to corroborate her account of onset. When petitioner first presented to the orthopedist, she reported that her pain had been occurring "ever since" her vaccination. (Ex. 3, p. 15.) This phrasing has previously been interpreted as being fairly read to mean an immediate post-vaccination onset. *E.g.*, *Chen v. Sec'y of Health & Human Servs.*, No. 21-0982V, 2025 WL 1454103, at *6 (Fed. Cl. Spec. Mstr. Apr. 4, 2025). The orthopedist also subsequently remarked that he did agree the pain was related to the vaccination, as it was not consistent with rotator cuff disease or arthritis. (Ex. 3, p. 12.) And, notwithstanding a typographic error (*see supra* note 3), petitioner's physical therapy evaluation explicitly placed onset of her right shoulder pain on September 11, 2020, the date of her flu vaccination, and further indicated that her presentation was consistent with SIRVA. (Ex. 4, pp. 16, 19.) Accordingly, petitioner's actual treatment records for the injury at issue do support an immediate post-vaccination onset.

Respondent is not wrong to suggest that delaying treatment and failing to report shoulder pain at the first opportunity can potentially be probative. However, neither factor is dispositive of the question of onset. *E.g.*, *Tenneson v. Sec'y of Health & Human Servs.*, 142 Fed. Cl. 329, 339-340 (2019) (finding no error where the special master explained why an emergency department encounter with no evidence of shoulder pain, which was the first post-vaccination medical encounter of any kind, was given less weight than other evidence regarding onset in a SIRVA case); *Amor v. Sec'y of Health & Human Servs.*, No. 20-0978V, 2024 WL 1071877, at *6 (Fed. Cl. Spec. Mstr. Feb. 8, 2024) (noting that it is "common for petitioners in SIRVA cases to delay seeking formal medical care for weeks, or even months, in hopes that the pain will resolve without treatment"). Ultimately, the medical records in this case reflect a three-month period between the time that petitioner was vaccinated and when she first sought orthopedic care. In and of itself, this is not an unusual pattern of treatment and would not defeat a SIRVA claim. *E.g.*, *Diaz v. Sec'y of Health & Human Servs.*, No. 20-1003V, 2023 WL 8440873, at *8 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding preponderant evidence of a 48-hour post-vaccination onset despite a three-month delay in seeking treatment). Afterall, "there is no such thing as an 'appropriate' time to seek treatment." *Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020). Nonetheless, respondent also stresses the silence of petitioner's October 20, 2020 primary care encounter. (ECF No. 47, pp. 15-19.) Respondent does not find it credible that petitioner would have refrained from reporting her condition, given her stated level of disability, yet also finds it implausible that petitioner could have reported her shoulder pain to her primary care provider given the silence of that record. (*Id.* at 15, 17-18.) However, considering the medical records as a whole, I do not agree. There are several reasons for this.

First, petitioner's orthopedic records show a prior instance from 2019 in which petitioner was referred by Dr. Luetke for orthopedic care without any correlating confirmation in Dr. Luetke's own records that the referral was made. Thus, although Dr. Luetke's records generally appear detailed and complete with respect to the condition for which she herself treated petitioner, I do not find that these records warrant a

presumption that Dr. Luetke would have documented an orthopedic complaint that resulted merely in an immediate referral to a specialist. This prior pattern discernable from Dr. Luetke's records is consistent with petitioner's testimony (albeit equivocal testimony) that she reported her shoulder pain to Dr. Luetke, who may have recommended that she see a specialist. (Tr. 31-32.) Second, and relatedly, petitioner's subsequent December 15, 2020 orthopedic record does indicate that Dr. Luetke was the referring physician. (Ex. 3, p. 15.) Accordingly, respondent's suggestion that petitioner's testimony impugns Dr. Luetke as unresponsive to her condition, or that petitioner had reason to be dissatisfied with her care from Dr. Luetke, is not persuasive. Third, the record of petitioner's October 20, 2020 encounter indicates only that her musculoskeletal examination showed a normal gait. (Ex. 2, p. 52.) This does not constitute evidence that she had a normal upper extremity exam. *Accord Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that the notation "Neurological: Not Present – Dizziness" does not constitute evidence that all possible neurologic symptoms or conditions were discussed). And, fourth, respondent's skepticism regarding the contrast between petitioner's complained of disability and her course of treatment, is directly answered by her initial orthopedic treatment record. That record confirms that when petitioner presented for care to the orthopedist, she reported a 50% reduction in her normal function in her right shoulder, but she also reported that her only treatment to date had been NSAIDS, heat and ice, and activity modification. (Ex. 3, p. 15.)

In light of all of the above, the evidence preponderates in favor of a finding that petitioner experienced the onset of right shoulder pain within 48 hours of her September 11, 2020 flu vaccination.

## VI.    Conclusion

This finding of fact concludes that (1) petitioner's September 11, 2020, flu vaccine was administered in her right arm and (2) petitioner experienced right shoulder pain within 48 hours of that vaccination. Further scheduling will be discussed in a follow up order.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master